1

2

3

4                          **UNITED STATES DISTRICT COURT**
                                 **DISTRICT OF NEVADA**
5                                   **RENO, NEVADA**

6

7
ZURICH AMERICAN INSURANCE COMPANY, )     3:08-CV-109-ECR-RAM
8                                  )
        Plaintiff,                 )
9                                  )
vs.                                )     **Order**
10                                  )
COEUR ROCHESTER, INC.,             )
11                                  )
        Defendant.                 )
12                                  )
                                   )
13 _____)

14      This diversity case arises out of a coverage dispute between an

15 insurer and its insured.  Plaintiff Zurich American Insurance

16 Company ("Zurich") filed suit for declaratory relief after denying a

17 claim filed by Defendant Coeur Rochester, Inc. ("Coeur") for loss or

18 damage of Coeur's insured property, a gold and silver mine.  Coeur

19 counterclaimed, alleging breach of contract, bad faith, and unfair

20 claims practices.  Both parties have filed motions for summary

21 judgment or partial summary judgment, and Zurich has raised several

22 evidentiary matters.

23      The motions are ripe, and we now rule on them.

24

25              **I. Factual and Procedural Background**

26      Coeur operates the Rochester and Nevada Packard Mine

27 ("Rochester Mine"), which consists of approximately 11,000 acres of

28 property near Lovelock, Nevada, on which Coeur both owns patented

mining claims and controls unpatented mining claims.  The Rochester

Mine includes the open-pit mine at issue in this case (the

"Rochester Pit"), which produces gold and silver ore.  The usual

method of mining at the Rochester Pit, like any open-pit mine,

involves dynamite blasts.  The blasts break ore from the ground in

the pit, which is then hauled away from the blast site for

processing.  On September 21, 2006, a planned dynamite blast not

only dislodged the expected bench[1] of ore on the pit floor, but also

resulted in the collapse of a section of the highwall[2] above the

bench.  After the collapse, it was determined that the highwall was

unstable, so that further mining of the affected area would be

unsafe.  Coeur later began operating the Rochester Pit again under a

---

[1] In his deposition testimony, Casey Kiel, a Coeur employee, explains that mining in the Rochester Pit was conducted in sections, called "benches," measuring 25 feet in height and denoted by their lowest elevation.  Thus, the "6100 bench" consisted of a section of rock with an elevation of 6100 feet at its bottom, and 6125 feet at its top.  A bench is mined by drilling holes into the top of the bench, packing the holes with dynamite, setting off a blast, and then hauling away the broken and severed ore, or "muck," loosened by the explosion from ore that remained "in-wall."  (See Kiel Depo. at 59:2-25 (#114-1).)  This terminology appears to have been the cause of some confusion about whether the blasting on September 21, 2006, was conducted on the 6125 bench or the 6100 bench.  (Compare P.'s MSJ at 4 (#82) (describing the  blast as conducted on the 6125 bench) with D.'s Opp. at 9 (describing the blast as conducted on the 6100 bench); see also Kiel Depo at 59:2-9 (Zurich's counsel asks "the blasting . . . occurred on the 6125 bench; is that correct?" and Kiel responds "the 6125 is the top . . . for operations we considered that the 6100 bench, because that's where we had mined to and that's where the final elevation would be of that.").)  It appears to be undisputed that the blast that caused the highwall collapse on September 21, 2006, was set off in holes drilled down from the 6125 foot elevation — there is no evidence sufficient to support a different conclusion in our record.  This would mean the blast was on the 6100 bench, as Mr. Kiel and Coeur use the term, and as we will use it in this Order.

[2] The term "highwall" refers to the face of unexcavated rock left in place as mining progresses downward into the pit.

2

revised mining plan, designed to avoid the danger of the unstable highwall.  This revised mining plan, however, required leaving a substantial amount of high-grade ore in place, while mining lower-grade replacement ore instead.

Coeur filed an insurance claim based on the policy issued to it by Zurich ("the Policy"); the claim was for a total of $7,435,327. Coeur's calculation of its damages has since been modified.[3]  Coeur now asserts a claim for net revenue from ore lost or damaged in the highwall collapse in the amount of $7,010,714, a sum which includes $8,467,068 for high-grade ore that could not be mined because of the collapse, minus $1,456,353 in lower-grade replacement ore mined as mitigation of damages. (D.'s Opp. at 6 (#89).[4]  In the alternative, Coeur asserts that it is entitled to collect the $7,010,714 under the business interruption coverage of the Policy.  (D.'s Opp. at 22 (#89).)  Also, Coeur seeks $51,839 in extra expenses incurred as a result of its mitigation efforts.  (Id. at 26.)

After an investigation, Zurich denied the claim on various grounds by means of a letter dated September 20, 2007.  (See Letter from Tracy Smith to Carolyn Turner (Sept. 20, 2007) ("Denial Letter"), Bithell Decl., Ex. T (#103-22).)  Coeur disputed this determination, but after further investigation, on December 5, 2007,

---

[3]  Zurich's objections to Coeur's evidence in support of its latest calculation of damages will be addressed below.

[4]  We note that $8,467,068 minus $1,456,353 totals $7,010,715. The discrepancy between that amount and the $7,010,714 claimed by Coeur is apparently the result of a typo or mathematical error, or perhaps an artifact of rounding.  (See D.'s Opp. at 6 (#89); Kiel Decl., Ex. 1 (#89-3).)

Zurich informed Coeur that it had decided to adhere to its decision to deny the claim.

On February 29, 2008, Zurich filed its Complaint (#1), seeking a declaratory judgment that Coeur's claim was properly denied. On June 11, 2008, Coeur filed its Answer and Counterclaim (#8), seeking damages for breach of contract, bad faith, and violation of Nevada's Unfair Trade Practices Act, Nev. Rev. Stat. § 686A.310.

Zurich filed the pending "Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment [Plaintiff Zurich American's Claim for Declaratory Relief; Counterclaimant Coeur Rochester's Claim for Breach of Contract]" (#81) on September 1, 2009. Coeur opposed (#89) the motion (#81), and Zurich replied (#98). Zurich also filed objections (#99) to certain evidence submitted by Coeur in opposition to the motion (#81). Coeur opposed (#113) Zurich's objections (#99), and Zurich replied (#125)

On September 28, 2009, Zurich filed a "Motion for Partial Summary Judgment [Coeur Rochester's Claims for Bad Faith, Violation of Nev. Rev. Stat. § 686A.310, Punitive Damages]" (#91). Coeur opposed (#103) the motion (#91), and Zurich replied (#115). On October 30, 2009, Zurich filed a "Motion to Exclude Evidence of Coeur's Damages Pertaining to Bad Faith, Statutory Violations Claims [FRCP 37(c)]" (#119). This motion (#119) seeks to exclude certain evidence Coeur submitted in opposition to Zurich's motion for partial summary judgment (#91). Coeur opposed (#126) the motion (#119), and Zurich replied (#127).

1    Also on September 28, 2009, Coeur filed a "Motion for Partial
2  Summary Judgment on Liability" (#94).  Zurich opposed (#106) the
3  motion (#94), and Coeur replied (#122).

4    Zurich requested (#100) oral argument on the pending motions
5  for summary judgment and partial summary judgment.  We granted
6  (#129) the request (#100).  The parties presented their oral
7  arguments at a hearing on June 15, 2010, after which the Court took
8  the matter under submission.

9
10              **II. Summary Judgment Standard**

11    Summary judgment allows courts to avoid unnecessary trials
12 where no material factual dispute exists.  N.W. Motorcycle Ass'n v.
13 U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).  The court
14 must view the evidence and the inferences arising therefrom in the
15 light most favorable to the nonmoving party, Bagdadi v. Nazar, 84
16 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment
17 where no genuine issues of material fact remain in dispute and the
18 moving party is entitled to judgment as a matter of law.  Fed. R.
19 Civ. P. 56(c).  Judgment as a matter of law is appropriate where
20 there is no legally sufficient evidentiary basis for a reasonable
21 jury to find for the nonmoving party.  Fed. R. Civ. P. 50(a).  Where
22 reasonable minds could differ on the material facts at issue,
23 however, summary judgment should not be granted.  Warren v. City of
24 Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct.
25 1261 (1996).

26    The moving party bears the burden of informing the court of the
27 basis for its motion, together with evidence demonstrating the

28                              5

1 absence of any genuine issue of material fact.  Celotex Corp. v.
2 Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met
3 its burden, the party opposing the motion may not rest upon mere
4 allegations or denials in the pleadings, but must set forth specific
5 facts showing that there exists a genuine issue for trial.  Anderson
6 v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Although the
7 parties may submit evidence in an inadmissible form — namely,
8 depositions, admissions, interrogatory answers, and affidavits —
9 only evidence which might be admissible at trial may be considered
10 by a trial court in ruling on a motion for summary judgment.  FED.
11 R. CIV. P. 56(c); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d
12 1179, 1181 (9th Cir. 1988).

13     In deciding whether to grant summary judgment, a court must
14 take three necessary steps: (1) it must determine whether a fact is
15 material; (2) it must determine whether there exists a genuine issue
16 for the trier of fact, as determined by the documents submitted to
17 the court; and (3) it must consider that evidence in light of the
18 appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary
19 judgment is not proper if material factual issues exist for trial.
20 B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir.
21 1999).  "As to materiality, only disputes over facts that might
22 affect the outcome of the suit under the governing law will properly
23 preclude the entry of summary judgment." Anderson, 477 U.S. at 248.
24 Disputes over irrelevant or unnecessary facts should not be
25 considered.  Id.  Where there is a complete failure of proof on an
26 essential element of the nonmoving party's case, all other facts
27 become immaterial, and the moving party is entitled to judgment as a
28

matter of law.  <u>Celotex</u>, 477 U.S. at 323.  Summary judgment is not a
disfavored procedural shortcut, but rather an integral part of the
federal rules as a whole.  <u>Id.</u>

## III. Discussion

Both Zurich and Coeur seek summary judgment on Zurich's
declaratory judgment claim and on the issue of liability with regard
to Coeur's breach of contract claim.  (P.'s Mot. (#81); D.'s Mot.
(#94).)  In addition, Zurich seeks summary judgment on Coeur's
claims for bad faith and for violation of Nevada's Unfair Trade
Practices Act.  (P.'s Mot. (#91).)  We will discuss these matters,
and the related evidentiary motions filed by Zurich, separately.

**A. Zurich's Objections (#99)**

Zurich presents several objections to evidence submitted by
Coeur in support of its opposition (#89) to Zurich's motion for
summary judgment (#81).  Specifically, Zurich objects to a
spreadsheet attached as an exhibit to the Declaration of Casey Kiel
(#89-3), as well as portions of the Kiel Declaration itself.  (<u>See</u>
Objections at 2 (#99).)  Zurich also objects to one paragraph of the
Declaration of Alan Tattersall (#89-4).  (<u>Id.</u>)  We will consider
each of these matters separately.

1. Exhibit to Kiel Declaration

Attached to the Kiel Declaration as Exhibit 1 is a spreadsheet
describing the damages Coeur alleges it suffered because of the
south highwall collapse.  (Kiel Decl., Ex. 1 (#89-3).)  This
spreadsheet has four separate boxes, the first three of which
calculate the net revenue from high-grade ore allegedly lost or

damaged as a result of the highwall collapse, while the fourth
accounts for the lower-grade replacement ore that Coeur mined
instead.  (Id.)  Zurich objects that when this document was
initially disclosed to them, the fourth box was omitted, and that
Coeur never disclosed the information contained therein pursuant to
Federal Rule of Civil Procedure 26.  As such, Zurich argues that the
items described in the fourth box constitute a new damages claim not
disclosed during discovery, which should be excluded from evidence
pursuant to Federal Rule of Civil Procedure 37(c).

Coeur asserts, and Zurich does not dispute, that Coeur notified
Zurich of the omitted fourth box of the spreadsheet at a discovery
status conference on March 30, 2009.  Coeur provided Zurich with the
full, corrected version of the spreadsheet on April 1, 2009, with a
letter explaining why the fourth box was omitted from the previously
provided version: it seems that there was a formatting error that
occurred in the conversion of the document from an Excel document to
a PDF document.  (See Ramirez Decl., Ex. 3 (#114-3).)  Zurich's
argument that the fourth box on the spreadsheet constitutes a new
claim, therefore, rests on a perceived distinction between
"providing" a document describing claimed damages to an opposing
party and "disclosing" such a document pursuant to Federal Rule of
Civil Procedure 26.  (See P.'s Reply at 3 (#125).)

Rule 26 requires that "a party must . . . provide to the other
parties . . . a computation of each category of damages claimed by
the disclosing party."  FED. R. CIV. P. 26(a)(1)(A)(iii).  Rule 26
further requires that such a disclosure must be supplemented "in a
timely manner if the party learns that in some material respect the

8

disclosure or response is incomplete or incorrect, and if the
additional or corrective information has not otherwise been made
known to the other parties during the discovery process or in
writing." FED. R. CIV. P. 26(e)(1)(A).  Here, Coeur learned that its
initial disclosure was incorrect because of the formatting problem
that caused the omission of the fourth box of the spreadsheet.  By
providing the corrected document to Zurich, together with an
explanation of the reason for the correction, Coeur effectively
supplemented its initial disclosure.  Furthermore, even accepting
for the sake of argument Zurich's perceived distinction between
"provide" and "disclose" — a distinction that is dubious at best, in
light of the appearance of the former word in the text of Rule
26(a) — it is undisputed that the additional or corrective
information was made known to Zurich during the discovery process.
As such, Zurich's argument that Coeur failed to comply with Rule 26
is without merit.

Moreover, Zurich's contention in its Reply (#125) that "Rule
37(c) mandates the exclusion of evidence that that [sic] has not
been disclosed 'as required by Rule 26(a) or (e)'" is a false
statement of the rule.  (P.'s Reply at 3 (#125).)  Rule 37(c)
requires exclusion only if the failure to disclose was not
"substantially justified or harmless," and even then sanctions other
than exclusion are available.  See FED. R. CIV. P. 37(c)(1)(A–C).
Coeur does not contend that there was any justification for the
omission, it was simply an error.  It appears, however, that the
error was entirely harmless.  Coeur informed Zurich of the missing
fourth box of the spreadsheet during discovery, and provided Zurich

1 with the corrected spreadsheet.  If Zurich required additional

2 discovery based on the newly provided information, it could have

3 requested it, either by stipulation or by motion.[5]  The information

4 in the fourth box of the spreadsheet does not describe an additional

5 damages claim, but rather Coeur's attempt to mitigate its damages,

6 which reduced Coeur's claim against Zurich by $1,456,353.  As such,

7 even if Coeur's actions with regard to the spreadsheet were to

8 constitute a violation of Rule 26 — which they do not — sanctions

9 pursuant to Rule 37 would be inappropriate.[6]

10       2. Kiel Declaration

11     Zurich objects to paragraph 6 of the Kiel declaration, which

12 reads in full: "A portion of Coeur's claim is for the loss of ore

13 that had been broken and severed from the 6100 bench by the blast

14 just prior to the collapse." (Kiel Decl. ¶ 6 (#89-3).)  Zurich

15 argues that this statement contradicts Mr. Kiel's deposition

16 _____

17     [5] It is worth noting that at Mr. Kiel's deposition on May 22,

18 2009, he was questioned about the incomplete version of the
spreadsheet even though Zurich had been provided the version
containing the initially omitted fourth box on April 1, 2009.

19 Zurich's counsel's comments during the deposition confirm that he was
aware that there were several versions of the document.  Mr. Kiel

20 asked to see "that net rev, the four box deal, the final net rev," to
assist him in answering a question. (Kiel Depo. at 65-66 (#85-25).)

21 Zurich's counsel responded: "Well, let's see.  I have one version of
it," referring to the three-box version, and then proceeded to

22 question Mr. Kiel about that version. (Id. at 66.)  Zurich's counsel
thus had an opportunity to depose Mr. Kiel about the complete version

23 of the spreadsheet, and chose not to make use of that opportunity.

24     [6] Not only are Rule 37 sanctions inappropriate, Zurich's
objections to the spreadsheet attached as an exhibit to the Kiel

25 Declaration are so profoundly lacking in merit that the Court has been
forced to consider whether to require counsel for Zurich to show cause

26 why they should not be sanctioned for violation of Federal Rule of
Civil Procedure 11(b)(2).  We have decided not to do so at this time.

27 Counsel for Zurich are cautioned, however, that we may decide
differently if they engage in further conduct of a similar nature.

28             10

testimony.   Zurich asserts that Mr. Kiel testified that Coeur's claim for "loss" of ore did not include any such broken and severed ore, or "muck."   Zurich asserts on this basis that paragraph 6 of Mr. Kiel's declaration should be excluded from consideration on summary judgment as a sham affidavit.   (Mot. at 2 (#99).)   We disagree.

At summary judgment, a district court may "disregard 'sham' affidavits that contradict deposition testimony submitted solely to generate [an] issue of fact for summary judgment purposes." Adler v. Fed. Republic of Nigeria, 107 F.3d 720, 728 (9th Cir. 1997) (citing Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir. 1991)).   A contradictory affidavit, however, is not necessarily a sham affidavit.   Rather, the court must make a "factual determination that the contradiction was actually a 'sham,'" as opposed to an attempt to explain certain aspects of confused deposition testimony, for example.   Id.   In making this determination, the Court must consider, among other things, whether "the party submitting the affidavit or declaration provides a sufficient explanation for the contradiction." Martinez v. Marin Sanitary Servs., 349 F. Supp. 2d 1234, 1242 (N.D. Cal. 2004).

During the portion of Mr. Kiel's deposition at issue, he was being questioned by Zurich's counsel about the damages spreadsheet discussed above — specifically, the version that was initially disclosed, missing the fourth section describing Coeur's mitigation efforts.   Zurich correctly notes that Mr. Kiel stated that "[t]here is no muck included on this spreadsheet."   (Kiel Depo. at 67:21-22 (#85-25).)   In context, however, Zurich's interpretation of Mr.

11

1  Kiel's statement is unpersuasive.  Zurich's counsel asked Mr. Kiel
2  to show him where on the spreadsheet was "set forth the amount of
3  muck that was left in the Coeur Rochester pit." (<u>Id.</u> at 66:4-6.)
4  Mr. Kiel indicated the box for the 6100 bench — containing the
5  number 100,749, representing tons of ore in that bench — but Mr.
6  Kiel conceded that not this entire amount was muck.  (<u>Id.</u> at 66:14-
7  18, 67:5.)  Zurich's counsel pressed the matter, stating "I'm trying
8  to find out where on this spreadsheet is it stated the amount of
9  muck that was left in the Coeur Rochester pit."  (<u>Id.</u> at 67:16-18.)
10 In response to this comment by Zurich's counsel, Mr. Kiel stated
11 that there "is no muck included on this spreadsheet."  (<u>Id.</u> at
12 67:21-22.)

13      In context, it is apparent that Mr. Kiel was not disclaiming
14 any amount of muck as an element of Coeur's claimed damages in this
15 case, as Zurich would have it.  Rather, Mr. Kiel was acknowledging
16 that the total amount of claimed lost or damaged ore from the 6100
17 bench in the third section of the spreadsheet, 100,749 tons, was not
18 broken out anywhere on the spreadsheet into a separate section for
19 "muck" and a separate section for ore that remained "in-wall" as of
20 the time of the highwall collapse.  In his declaration, Mr. Kiel
21 answers a question that Zurich's counsel never asked him: how much
22 of the ore listed at the 6100 bench consisted of muck?  Mr. Kiel
23 states in his declaration that "a portion of Coeur's claim is for
24 loss of ore that had been broken and severed from the 6100 bench by
25 the blast just prior to the collapse," and specifies that this
26 amount was 89,768 tons, with a value of $348,787.  (<u>Id.</u> ¶¶ 6-7.)
27 Thus, Mr. Kiel does not contradict his deposition testimony in his

1  declaration, but rather explains it by expanding upon it.  To the

2  extent that Mr. Kiel's deposition testimony could be interpreted to

3  contradict his declaration, Coeur has provided a sufficient

4  explanation for the contradiction.  Paragraph six of the Kiel

5  Declaration is not a "sham," and Zurich's objection to it will be

6  overruled.

7      Zurich also objects to paragraph 8 of Mr. Kiel's declaration,

8  which reads in full as follows: "Some of the broken and blasted ore

9  at the 6100 bench sustained direct physical damage by being covered

10  up by the slide material after the collapse."  (Id. ¶ 8.)  Zurich

11  objects to the use of the phrase "direct physical damage"; Zurich

12  argues that Mr. Kiel's characterization constitutes a legal

13  conclusion or an opinion about an ultimate issue in the case, which

14  should be excluded.  (P.'s Mot. at 3-4.)

15     Zurich's apparent point in raising this objection is well

16  taken: Mr. Kiel's use of the phrase "direct physical damage" is not

17  probative of the meaning of the phrase "direct physical damage" as

18  that term is used in the Policy, nor is it probative of whether any

19  ore suffered such damage as a result of the highwall collapse.

20  Nevertheless, Coeur does not offer Mr. Kiel's declaration as

21  evidence for that purpose (see D.'s Opp. at 10-11), nor will we

22  consider it for that purpose.  The remainder of paragraph 8 is

23  essentially a gloss on what Mr. Kiel means by the phrase: he saw

24  broken and blasted ore covered up by slide material.  As a lay

25  observation of what happened during the slide, this statement is

26  unobjectionable.  Moreover, for reasons that will become apparent

27  below, the issue is moot: our rulings on the pending dispositive

28

13

motions do not turn on the issue of whether there was "direct physical damage" to the ore or not.  Zurich's objection, therefore, will be overruled.

### 3. Tattersall Declaration

Zurich objects to paragraph 7 of Mr. Tattersall's declaration, which reads in part as follows: "On September 21, 2006, Coeur conducted a production blast on the 6100 bench of the Rochester Mine.  The blast broke and severed ore from the 6100 bench."  Zurich contends that Mr. Tattersall testified at his deposition that blasting was conducted on the 6125 bench on the day of the slide, and that his declaration to the contrary should be stricken.

Mr. Tattersall's deposition testimony identifying the 6125 bench as the site of blasting on September 21, 2006, appears to have been the result of a failure of memory.  Though he answered Zurich's counsel's questions referring to blasting on the 6125 bench on the day of the highwall collapse, Mr. Tattersall also testified that he did not recall for certain what bench was being worked on, and suggested that Mr. Kiel, whose deposition was to be taken the next day, would be a better source of information on that issue.  (See Tattersall Depo. at 274-275 (#85-24).)  As noted above, Mr. Kiel explained in his deposition testimony that blasts set off in holes drilled down from the 6125 foot elevation are on the 6100 shelf according to the designations used by Coeur.  To the extent that Mr. Tattersall's declaration contradicts his deposition testimony, Coeur provides a sufficient explanation for the contradiction, and we are convinced the declaration is not a sham designed solely to generate an issue of fact for summary judgment purposes.

14

1    Moreover, Zurich has not pointed out, nor have we discovered,
2  any issue now pending before the Court, the resolution of which
3  changes as a result of striking or not striking this portion of Mr.
4  Tattersall's declaration.  As such, Zurich's objection is moot and
5  would be overruled on that basis, even if it did not fail on its
6  merits.

7         **B. Zurich's Liability under the Policy**

8    Both Zurich and Coeur have moved for summary judgment on the
9  issue of Zurich's liability under the Policy.  Zurich contends that
10 it has no liability under the Policy; Coeur contends that Zurich is
11 liable for the entire value of the high grade ore that now cannot be
12 mined as a result of the highwall collapse, minus the value of
13 lower-grade ore mined in mitigation of those damages, but plus extra
14 expenses incurred as a result of those mitigation efforts.  (See
15 P.'s Mot. (#81); D.'s Mot. (#94).)  For the reasons stated below,
16 Zurich has the better side of this dispute.

17    In diversity actions, federal courts apply substantive state
18 law.  Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Nitco
19 Holding Corp. v. Boujikian, 491 F.3d 1086, 1089 (9th Cir. 2007).
20 Under Nevada law, "[a]n insurance policy is a contract that must be
21 enforced according to its terms to accomplish the intent of the
22 parties."  Farmers Ins. Exch. v. Neal, 64 P.3d 472, 473 (Nev. 2003).
23 When the facts are not in dispute, contract interpretation is a
24 question of law.  Grand Hotel Gift Shop v. Granite State Ins. Co.,
25 839 P.2d 599, 602 (Nev. 1992).  The language of the insurance policy
26 must be viewed "from the perspective of one not trained in law," and
27 we must "give plain and ordinary meaning to the terms."  Farmers

28                                    15

1  Ins. Exch., 64 P.3d at 473 (internal quotation marks omitted).

2  "Unambiguous provisions will not be rewritten; however, ambiguities

3  are to be resolved in favor of the insured." Id. (footnote

4  omitted); see also Fed. Ins. Co. v. Am. Hardware Mut. Ins. Co., 184

5  P.3d 390, 392 (Nev. 2008) ("In the insurance context, we broadly

6  interpret clauses providing coverage, to afford the insured the

7  greatest possible coverage; correspondingly, clauses excluding

8  coverage are interpreted narrowly against the insurer.") (internal

9  quotation marks omitted); Capitol Indemnity Corp. v. Wright, 341 F.

10 Supp. 2d 1152, 1156 (D. Nev. 2004) (noting that "a Nevada court will

11 not increase an obligation to the insured where such was

12 intentionally and unambiguously limited by the parties").

13     The Policy is an "all-risk" policy: rather than providing

14 coverage by reference to "enumerated perils," as in a typical

15 liability policy, an all-risk policy covers against any fortuitous

16 loss or damage to covered property, while specific exclusions

17 "generally are the limitations on coverage." Jackson v. State Farm

18 Fire & Cas. Co., 835 P.2d 786, 789 n.4 (Nev. 1992) (citing Garvey v.

19 State Farm Fire & Casualty Co., 770 P.2d 704, 711 (Cal. 1989)).

20 Thus, the Policy covers "all risks of direct physical loss or damage

21 . . . from any external cause, except as specifically excluded."

22 (Policy at 2, 6 (#89-16).)  The property covered by the Policy is

23 also described in broad terms, including, among other things, "[t]he

24 interest of [Coeur] in all Real and Personal Property owned by

25 [Coeur] . . . comprising a part of and/or appertaining to their

26 operations" at any location listed on a separate schedule, which the

27 parties agree includes the Rochester Pit.  (Id. at 6.)

28                                16

Zurich contends that Coeur's claim for lost or damaged high-grade ore was properly rejected because, inter alia, it falls under several specific exclusions.[7]  We agree.  Property specifically excluded from coverage under the Policy includes "[c]urrency, deeds, evidence of debt or title, notes, jewelry, precious stones, furs, fine arts, gold, silver, platinum and other precious alloys or metals except as provided elsewhere in this policy."  (Id.)  Though Coeur frames its claim as one for high-grade ore, rather than for gold or silver, the ore's only value is that of the precious metals contained therein, less the cost of extraction.  (See Depo. of Carolyn Turner at 78:17-79:3 (#85-13); Depo. of Elizabeth Druffel at 46:25-49:1, 49:22-50:9 (#85-18); Kiel Decl., Ex. 1 (#89-3).)  The gold and silver in the ore is not transformed or changed during processing; it is only separated from the rock in which it was previously embedded.[8]  As such, based on the plain language of this exclusion, the gold and silver contained in the claimed high-grade ore is not property covered under the Policy.

---

[7]  Coeur has not asserted any right to recover on the basis of direct physical damage to the Rochester Pit itself from the highwall collapse, though it would seem that the collapse would constitute direct physical damage to real property.  It may be that Coeur only holds an unpatented mining claim for the real estate at issue, and therefore does not have own any interest in the land itself, so as to potentially trigger coverage on that basis. Our record, however, is silent on this specific question.  (See D.'s Countercls. ¶ 1 (#8) (stating that Couer both owns patented mining claims and controls unpatented mining claims in the area referred to as the Rochester Mine).)  In any case, at every stage of this dispute, Coeur has sought to recover for allegedly lost or damaged ore, and we will consider its claim on that basis.

[8]  Thus, the analogy suggested by Coeur at oral argument to wine produced from grapes or sugar from sugar beets is imprecise.

17

1    Coeur invokes the doctrines of <u>noscitur a sociis</u> and <u>ejusdem</u>

2  <u>generis</u>, arguing that the exclusion is better read to apply only to

3  coins made of precious metals or "items of personal adornment," as

4  opposed to precious metals that remain unextracted from ore.  (D.'s

5  Opp. at 17-18 (#89).)  At oral argument, Coeur refined this argument

6  somewhat, suggesting that the exclusion applies to items of personal

7  property, which can easily be removed or stolen.  Coeur's arguments,

8  however, are not persuasive.  "Currency, deeds, evidence of debt or

9  title, notes" and "fine arts" are neither coins nor items of

10  personal adornment, and precious stones and precious metals are only

11  sometimes used for such purposes.  Similarly, fine arts, gold,

12  silver, and other precious metals are only sometimes in forms that

13  can be considered personal property, easily removed or stolen.

14  Moreover, Coeur's arguments do not account for the last clause of

15  the exclusion: ". . . except as provided elsewhere in this policy."

16  The Policy specifically provides elsewhere for $2 million limit on

17  coverage for "Precious Metals (Coverage provided only while Precious

18  Metals situated in Pour Room at Lovelock, NV location)."  (Policy at

19  2 (#89-16).)  This provision suggests that it is not the form that

20  the precious metals are in, but rather their location that

21  determines whether or not they are excluded from coverage under the

22  Policy — or, more precisely, whether they are excepted from

23  exclusion from coverage.  We conclude, therefore, that Coeur's claim

24  for lost or damaged high-grade ore was properly denied under the

25  Policy's exclusion for gold, silver, and other precious metals.

26    Zurich also could have properly denied all, or at least most,

27  of Coeur's claim for loss or damage to high-grade ore under the

28                              18

exclusion for "[c]rude oil, natural gas, coal or other minerals prior to recovery above ground." (Id. at 6.) Coeur argues that this exclusion does not apply to open-pit mines, but only to underground mines. (D.'s Opp. at 20-21 (#89).) This argument, however, is unsupported by the plain language of the exclusion, which makes no distinction between underground mines and open-pit mines. Furthermore, even in an open-pit mine, the minerals that are being extracted are underground, in the plain and ordinary meaning of the term, until they are recovered — hence the need to drill down from the surface of the pit into a bench of ore and set off dynamite blasts to sever it from deeper benches. Coeur has a plausible argument that this exclusion does not apply to ore from the 6100 bench that was blasted and severed from the underlying benches immediately prior to the south highwall collapse. On this view, the ore in the 6100 bench was recovered above ground, at least momentarily, before being covered by debris from the highwall collapse.[9] Nevertheless, only a small percentage of Coeur's total claim is for ore that had been broken and severed from the 6100 bench. (See Kiel Decl. ¶ 5-7 (#89-3).) And, as discussed above, the claim for even that small portion of the ore was properly denied under the exclusion for gold, silver, and other precious metals. Thus, Coeur's entire claim for $7,010,714 based on the value of gold

---

[9] Zurich argues that "recovery above ground" does not occur until the broken and blasted ore is lifted off of the ground by loaders for placement in trucks; until then, the ore has merely been "loosened" from the underlying layers of ore. (P.'s Reply at 12-13 (#98).) In light of the requirement that ambiguous provisions be interpreted "to afford the insured the greatest possible coverage," Fed. Ins. Co., 184 P.3d at 392, Zurich has the weaker argument here.

1 and silver contained in allegedly lost or damaged ore was properly

2 denied pursuant to specific exclusions in the Policy.[10]

3      Coeur also asserts, in the alternative, that it is entitled to

4 recover on its claim pursuant to the business interruption

5 provisions of the Policy.  The Policy provides coverage "against

6 loss resulting directly from the necessary interruption of business

7 caused by direct physical damage to or destruction of real or

8 personal property, except finished stock, by the peril(s) insured

9 against, during the term of this policy, on premises occupied by the

10 Insured and situated as described under the Property Insured."

11 (Policy at 15 (#89-16).)  Business interruption coverage does not

12 apply, however, until the period of the interruption exceeds 360

13 hours.  Zurich's liability is further limited to 100% of "gross

14 earnings," as that term is defined in the Policy, that would have

15 been earned during the twelve months immediately following the date

16 of the interruption, no matter how long the interruption continues.

17 (Policy at 3, 5 (#89-16).)

18      It is undisputed that Coeur's employees and equipment were put

19 back to work on other portions of the Rochester Mine shortly after

20 the highwall collapse, well within the 360 hour deductible.  Coeur's

21 argument, however, is that the highwall collapse permanently

22 interrupted its business by requiring abandonment of its previous

23

24      [10] We need not address the parties' further arguments relating to
other exclusions in the Policy, or the question of whether there was

25 a "direct physical loss or damage" of the ore, in the meaning of the
policy.  We also emphasize that our analysis is based solely on the

26 language of the policy itself and the undisputed facts: the parties'
arguments regarding the meaning of the Policy based on evidence other

27 than the language of the Policy itself are irrelevant, and were not
considered.

28

mining plan.  This resulted in a reduction of gross earnings, measurable by the difference between the value of ore that would have been mined under the old mining plan, minus the value of lower-grade ore mined instead under the revised mining plan — in other words, the same $7,010,714 as Coeur claims under the physical damage provisions of the policy.

Business interruption insurance does not provide a guarantee that the insured's business plan will be fully implemented as hoped, as Coeur would have it.  On its own terms, the Policy provides coverage for losses resulting "directly from the necessary interruption of business," that is, the interruption of mining operations, not interruption of work pursuant to any particular mining plan.  See, e.g., Winters v. State Farm Fire & Cas. Co., 73 F.3d 224, 228-29 (9th Cir. 1995) (citing Pac. Coast Eng'g Co. v. St. Paul Fire & Marine Ins. Co., 88 Cal. Rptr. 122 (Cal. Ct. App. 1970), for the proposition that "business interruption insurance provides coverage only for losses directly resulting from interruption of business and not merely from interruption of work on a particular product"); Buxbaum v. Aetna Life & Cas. Co., 126 Cal. Rptr. 2d 682, 691-692 (Cal. Ct. App. 2002) (rejecting law firm's claim under business interruption policy because the policy provided coverage "only for losses resulting directly from interruption of the business, i.e., operation of the firm, and not merely from interruption of the work being done on a particular client matter at the time of the occurrence of a peril insured against") (quoting

1   <u>Pac. Coast Eng'g Co.</u>, 88 Cal. Rptr. at 124.[11]  Business interruption

2   coverage is only available under the Policy when the "determined

3   period of interruption" of mining operations "exceeds 360 hours."

4   (Policy at 3 (#89-16).)  Here, there was no such interruption of

5   greater than 360 hours; though mining operations had to be moved to

6   other, apparently less productive areas of the Rochester Mine,

7   Coeur's employees and equipment from the area affected by the

8   highwall collapse were back in business shortly after the collapse.

9   Thus, Coeur is not entitled to recover under the business

10  interruption provisions of the Policy.

11       Several courts have been sympathetic to the view espoused by

12  Coeur that such a conclusion in essence punishes Coeur for

13  attempting to mitigate its damages in a timely manner.  <u>See</u> <u>Maher v.</u>

14  <u>Cont'l Cas. Co.</u>, 76 F.3d 535, 539 n.1 (4th Cir. 1996); <u>Am. Med.</u>

15  <u>Imaging Corp. v. St. Paul Fire & Marine Ins. Co.</u>, 949 F.2d 690, 692-

16  93 (3d Cir. 1991).  We disagree.  "If the insured continues to

17  operate despite physical damage, business interruption coverage does

18  not apply."  <u>Buxbaum</u>, 126 Cal. Rptr. 2d at 693-94.  An insured "is

19  not 'punished' by continuing business at a lower level following an

20  _____

21       [11] As noted above, Nevada law applies in this case.  Nevada case
     law interpreting business interruption clauses, however, is sparse.

22       Where the Nevada Supreme Court has not addressed an issue, "we must
     use our best judgment to predict how that court would decide it."

23   <u>Capital Dev. Co. v. Port of Astoria</u>, 109 F.3d 516, 519 (9th Cir. 1997)
     (quoting <u>Allen v. City of L.A.</u>, 92 F.3d 842, 847 (9th Cir. 1996).  In

24   the context of interpreting insurance policy terms, the Nevada Supreme
     Court has often looked to persuasive precedent from other

25   jurisdictions, especially California.  <u>See, e.g.</u>, <u>Fed. Ins. Co.</u>, 184
     P.3d at 395 (beginning a discussion of authority from other

26   jurisdictions with analysis of California appellate court decision);
     <u>Jackson</u>, 835 P.2d at 789 n.4 (citing California appellate court

27   decision regarding all-risk policies).  We shall take a similar
     approach here.

28                                    22

event causing a physical loss or damage because, if in fact the insured is able to continue business following the event, the business interruption coverage never applied in the first place." Id. at 694.  Here, Coeur was forced to interrupt its business for a short period of time, but was able to resume operations well within the 360 hour deductible that applies to its business interruption coverage.  As such, the business interruption coverage of the Policy never applied, and Coeur's claim on that basis was properly rejected.

Coeur's claim for extra expenses associated with mitigating its damages depends on Coeur having a viable claim under either the physical damage provisions or the business interruption provisions of the Policy.  (See D.'s Opp. at 27 (#89) (arguing that the "Extra Expense Coverage is contained in a separate section of the policy and applies to losses under both the property damage and business interruption coverage provisions").)  Zurich disputes Coeur's interpretation of the Policy with regard to extra expenses, arguing that the extra expense coverage applies only to claims under the business interruption provisions of the Policy, and not to the physical damage provisions.  (See D.'s Mot. at 31 (#82).)  We have concluded, however, that Coeur is not entitled to recover under either theory.  As such, there is no basis for Coeur to recover its claimed extra expenses, and we need not resolve the dispute between the parties regarding the applicability of the extra expense provisions of the Policy.

In short, Coeur's claims under the Policy were properly rejected by Zurich.  Coeur's claim for lost or damaged ore falls

23

under one or more specific exclusions from coverage.  The business
interruption provisions of the Policy were not triggered, because
Coeur's business was not interrupted for a period longer than the
applicable 360 hour deductible.  Coeur's claim for extra expenses
fails because Coeur has no valid claim under either the physical
damage provisions or business interruption provisions of the Policy.
As such, Zurich is entitled to summary judgment in its favor on the
issue of liability under the Policy.

### C. Coeur's Bad Faith Claim

Zurich seeks summary judgement in its favor on Coeur's second
claim for relief for bad faith breach of an insurance contract.
Under Nevada law, bad faith is "an actual or implied awareness of
the absence of a reasonable basis for denying benefits of the
insurance policy." <u>Allstate Ins. Co. v. Miller</u>, 212 P.3d 318, 324
(Nev. 2009) (citing <u>U.S. Fid. v. Peterson</u>, 540 P.2d 1070, 1071
(1975)).  Here, as discussed above, Zurich had a reasonable basis
for denying Coeur's claims, namely, Coeur is not entitled to recover
under the terms of the Policy.  As such, Zurich is entitled to
summary judgment in its favor on this claim for relief.

### D. Coeur's Claim Pursuant to Nev. Rev. Stat. § 686A.310.

Zurich also seeks summary judgment on Coeur's claim for relief
pursuant to Nev. Rev. Stat. § 686A.310 regarding the manner in which
Zurich processed its claim.  Our conclusions regarding the propriety
of Zurich's denial of the claim and lack of bad faith are not
dispositive of this issue.  Unlike a cause of action for bad faith,
the provisions of Nev. Rev. Stat. § 686A.310 "address the manner in
which an insurer handles an insured's claim whether or not the claim

24

1 is denied." <u>Schumacher v. State Farm Fire & Cas. Co.</u>, 467 F. Supp.

2 2d 1090, 1095 (D. Nev. 2006) (citing <u>Pioneer Chlor Alkali Co., Inc.</u>

3 <u>v. Nat'l Union Fire Ins. Co.</u>, 863 F. Supp. 1237, 1243 (D. Nev.

4 1994)).  Coeur argues that Zurich breached six subsections of Nev.

5 Rev. Stat. § 686A.310.  We will analyze each of these arguments

6 separately.

7              1. Nᴇᴠ. Rᴇᴠ. Sᴛᴀᴛ. § 686A.310(1)(a)

8      Coeur argues that Zurich violated the subsection that defines

9 "misrepresenting to insureds or claimants pertinent facts or

10 insurance policy provisions relating to any coverage at issue" to be

11 an "unfair practice."  Nᴇᴠ. Rᴇᴠ. Sᴛᴀᴛ. § 686A.310(1)(a).  Coeur

12 points to two alleged misrepresentations of pertinent facts in

13 particular, both from the September 20, 2007, letter in which Zurich

14 denied Coeur's claim.  (<u>See</u> Denial Letter (#103-22).)  In each case,

15 Coeur complains that Zurich misrepresents Coeur's claims.  First is

16 a passage that reads as follows:

17      [the claimed lost ore] has not itself suffered any "direct
     physical" loss or damage.  Nor is Coeur presenting a claim
18      for any such 'direct physical' loss or damage' to that ore
     itself.  Instead, Coeur is seeking to recover the lost
19      mining value because of the ore's inaccessibility in the
     step-out and the berm.  The mere detrimental economic
20      impact because of Coeur's lost mining capacity does not
     present a claim for "direct physical" loss or damage to
21      property . . . ."

22 (<u>Id.</u> at 16-17.)  Coeur argues that, to the contrary, it has asserted

23 precisely a claim for "direct physical loss or damage to that ore

24 itself."  Second, Coeur objects to the letter's next paragraph, in

25 which Zurich finds that, even if there were direct physical loss or

26 damage, such loss or damage would be properly denied pursuant to an

27 exclusion for damage resulting from "faulty workmanship," "faulty

28                                      25

1  methods of construction," and/or "faulty errors or omissions in

2  design." (Id. at 17.)  Coeur argues that this assertion amounts to

3  a misrepresentation of Coeur's claim because Coeur never made a

4  claim for damage to the highwall, so as to trigger the provisions of

5  the Policy that could relate to the design or construction of the

6  highwall, but only made a claim for lost ore.

7      Coeur has not pointed out, nor have we discovered, any

8  authority supporting the notion that such statements could

9  constitute a violation of Nev. Rev. Stat. § 686A.310(1)(a).  This

10 subsection prohibits such malfeasance as an insurer misrepresenting

11 the terms of an insurance policy to its insured, or misrepresenting

12 to its insured facts that are within the insurer's knowledge that

13 could give rise to coverage.  See, e.g., Albert H. Wohlers & Co. v.

14 Bartgis, 969 P.2d 949, 961 (Nev. 1998) (insurer misrepresented to

15 the insured that a policy was similar to the insured's previous

16 policy and unilaterally inserted provisions into the policy without

17 disclosing their effect to the insured); Stalberg v. W. Title Ins.

18 Co., 282 Cal Rptr. 43, 50 (Cal. Ct. App. 1991) (under similar

19 provision of California law, finding substantial evidence of

20 violation where insurer created and recorded "wild" deeds containing

21 fictitious easements, and concealed this fact from its insured).

22 Zurich's characterizations of Coeur's claim in the Denial Letter are

23 not misrepresentations of the terms of the Policy or of pertinent

24 facts relating to coverage, but rather constitute Zurich's analysis

25 of the Policy and the facts pertinent to Coeur's claim.  An

26 insurer's analysis of an insured's claim in a letter denying

27 coverage need not necessarily be framed in the manner that the

28

1   insured would prefer.  As such, Zurich is entitled to summary

2   judgment on Coeur's claim pursuant to Nev. Rev. Stat.

3   § 686A.310(1)(a).

4                2. Nev. Rev. Stat. § 686A.310(1)(c)

5        Coeur argues that Zurich violated the subsection that defines

6   "[f]ailing to adopt and implement reasonable standards for the

7   prompt investigation and processing of claims arising under

8   insurance policies" to be an "unfair practice."  Nev. Rev. Stat.

9   § 686A.310(1)(c).  Coeur's claim under this subsection relates

10  primarily to the qualifications and performance of the people

11  conducting the investigation of Coeur's claim.[12]  Coeur concedes

12  that Zurich did adopt and implement best practices guidelines in

13  April 2007.  (D.'s Opp. at 27-28 (#103).)  Coeur's argument is only

14  that Zurich's employees or agents violated those standards, which is

15  perhaps a subspecies of failure to implement reasonable standards,

16  though Coeur does not present, and we have not discovered, any

17  authority in support of that proposition.  Moreover, there is no

18  indication that the qualifications or performance of the people

19  conducting the investigation of Coeur's claim had any bearing on the

20  outcome or timing of Zurich's coverage decision.  Zurich did not

21  fail to investigate Coeur's claim appropriately; rather, Zurich

22  rejected Coeur's reasoning in support of its claim.  Cf. Pioneer

23  Chlor Alkali, 863 F. Supp. at 1249 (finding genuine issue of fact

24  regarding section 686A.310(c) claim where there was some evidence

25  that the insurance company did not investigate all claimed theories

26  _____

27       [12] Coeur also repeats arguments that primarily relate to Nev. Rev.
    Stat. § 686A.310(1)(d).  We will address these arguments below.

28                                      27

regarding cause of loss).  As such, Zurich did not violate this subsection, and is entitled to summary judgment in its favor on this issue.

### 3. NEV. REV. STAT. § 686A.310(1)(d)

Coeur argues that Zurich violated the subsection that defines "[f]ailing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured" to be an "unfair practice."  NEV. REV. STAT. § 686A.310(1)(d).  Coeur argues that its claim was submitted on December 1, 2006, and that "detailed documentation" of the claim was submitted in January 2007.  The "detailed documentation" to which Coeur refers, however, is only a brief letter summarizing Coeur's understanding of the facts, and a brief summary of the claim; it is not "detailed documentation" of the claim.  In fact, the first paragraph of the letter indicates that if Zurich were to "desire more detail," Coeur would "attempt to accommodate [Zurich's] request."  (See Letter from Carolyn Turner to Joe Bauer (January 24, 2007), Bithell Decl., Ex. L (#103-14).)  In the following months Coeur submitted certain documentation in support of the revised claim, but did not immediately complete its proof of loss requirements; the evidence in the record supports Zurich's contention that the proof of loss requirements were not completed until July 11, 2007.[13]  (See D.'s Mot. at 27 (#92); Framson Decl., Ex. 23 (## 95-24) (summary of dates on which documentation from

---

[13] Contrary to Coeur's assertion, presented at oral argument, it was perfectly appropriate for Zurich to wait for a complete assessment regarding the cause of the highwall collapse before affirming or denying coverage on Coeur's claim.

1  Coeur was received).)  As noted above, Zurich denied Coeur's claim
2  on September 20, 2007.  Thus, there was a delay of just over two
3  months, from July 11, 2007, until September 20, 2007, between Coeur
4  completing its proof of loss requirements and Zurich's decision
5  regarding the claim.  There is no authority in support of the notion
6  that such a short delay could support a claim under Nev. Rev. Stat.
7  § 686A.310(d), especially with regard to a large claim involving
8  relatively complex technical questions.  <u>Cf.</u> <u>Estate of Lomastro ex</u>
9  <u>rel Lomastero v. Am. Family Ins. Group</u>, 195 P.3d 339, 351-52 (Nev.
10 2008) (finding genuine issue of material fact as to whether ten-
11 month delay without affirming or denying coverage on a claim
12 involving a single-vehicle rollover accident was unreasonable).  As
13 such, Zurich is entitled to summary judgment in its favor on this
14 claim.

15          4. NEV. REV. STAT. § 686A.310(1)(e)

16     Coeur argues that Zurich violated the subsection that defines
17 "[f]ailing to effectuate prompt, fair and equitable settlements of
18 claims in which liability of the insurer has become reasonably
19 clear" to be an "unfair practice."  NEV. REV. STAT. § 686A.310(1)(e).
20 As discussed above, Zurich is not liable here.  Thus, Coeur's
21 arguments relating to this subsection fail.

22          5. NEV. REV. STAT. § 686A.310(1)(f)

23     Coeur argues that Zurich violated the subsection that defines
24 "[c]ompelling insureds to institute litigation to recover amounts
25 due under an insurance policy by offering substantially less than
26 the amounts ultimately recovered in actions brought by such
27 insureds, when the insureds have made claims for amounts reasonably

28                              29

1   similar to the amounts ultimately recovered" to be an "unfair

2   practice."  NEV. REV. STAT. § 686A.310(1)(f).  Again, Coeur's claims

3   under the Policy were properly rejected, so Zurich did not violate

4   this subsection.

5           6. NEV. REV. STAT. § 686A.310(1)(n)

6        Coeur argues that Zurich violated the subsection that defines

7   "[f]ailing to provide promptly to an insured a reasonable

8   explanation of the basis in the insurance policy, with respect to

9   the facts of the insured's claims and the applicable law, for the

10  denial of his claim or for an offer to settle or compromise his

11  claim" to be an "unfair practice."  NEV. REV. STAT. § 686A.310(1)(n).

12  As discussed above, Zurich's denial of Coeur's claim was reasonably

13  timely.  Furthermore, the September 20, 2007, denial letter is a

14  detailed explanation of Zurich's basis for denying the claim,

15  examining in detail the Policy, the facts of Coeur's claim and the

16  applicable law.  (Denial Letter, (#103-22).)  Though the letter's

17  analysis reaches the same conclusion we have by means of somewhat

18  different reasoning, there is nothing inherently unreasonable or

19  absurd about Zurich's analysis.  In short, there is no evidence in

20  the record that could support Coeur's claim that Zurich violated

21  this subsection.

22  **D. Zurich's Motion to Exclude (#119)**

23       Zurich has moved to exclude certain evidence relating to

24  damages submitted by Coeur in support of its opposition to Zurich's

25  motion for summary judgment regarding Coeur's bad faith claim and

26  claim pursuant to Nev. Rev. Stat. § 686A.310.  For the reasons

27  stated above, Zurich is entitled to summary judgment in its favor on

28                                    30

those claims, whether or not Coeur's evidence is excluded.  As such, Zurich's motion (#119) is moot, and will be denied on that basis.

### IV. Conclusion

Zurich properly denied Coeur's claims under the Policy because the alleged property damage was specifically excluded from coverage and Coeur suffered no business interruption longer than the Policy's 360 hour deductible.  Thus, Coeur's causes of action for breach of contract and bad faith fail.  Further, the evidence in the record is insufficient to support any of Coeur's allegations under Nevada's Unfair Trade Practices Act, Nev. Rev. Stat. § 686A.310.  Zurich is therefore entitled to summary judgment in its favor on its claim for declaratory relief, and with regard to all of Coeur's counterclaims.

**IT IS, THEREFORE, HEREBY ORDERED THAT** Zurich's "Objections to Evidence Submitted by Coeur Rochester in Opposition to Zurich American's Motion for Summary Judgment" (#99) are **OVERRULED**.

**IT IS FURTHER ORDERED THAT** Zurich's "Motion to Exclude Evidence of Coeur's Damages Pertaining to Bad Faith, Statutory Violations Claims [FRCP 37(c)]" (#119) is **DENIED** as moot.

**IT IS FURTHER ORDERED THAT** Zurich's "Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment [Plaintiff Zurich American's Claim for Declaratory Relief; Counterclaimant Coeur Rochester's Claim for Breach of Contract]" (#81) is **GRANTED**.

1     **IT IS FURTHER ORDERED THAT** Zurich's "Motion for Partial Summary
2 Judgment [Coeur Rochester's Claims for Bad Faith, Violation of Nev.
3 Rev. Stat. § 686A.310, Punitive Damages]" (#91) is **GRANTED**.

4

5     **IT IS FURTHER ORDERED THAT** Coeur's "Motion for Partial Summary
6 Judgment on Liability" (#94) is **DENIED**.

7

8     The Clerk shall enter judgment accordingly.

9

10

11 DATED: June 24, 2010.

12                                              _Edward C. Reed._

13                                    UNITED STATES DISTRICT JUDGE

32